NO. 4-09-0682     Opinion Filed 5/11/11

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS,  )   Appeal from
          Plaintiff-Appellee,        )   Circuit Court of
          v.                         )   McLean County
HENRY LEE ALLEN,                     )   No. 08CF1194
          Defendant-Appellant.       )
                                     )   Honorable
                                     )   James E. Souk,
                                     )   Judge Presiding.
_____

          PRESIDING JUSTICE KNECHT delivered the judgment of the
court, with opinion.
          Justices Appleton and Pope concurred in the judgment
and opinion.

**OPINION**

          In March 2009, following a bench trial, the trial court
convicted defendant, Henry Lee Allen, of unlawful possession of a
controlled substance with intent to deliver and unlawful posses-
sion of a controlled substance.  In April 2009, the court sen-
tenced defendant on his possession-with-intent-to-deliver convic-
tion to 12 years' imprisonment; finding it was an included
offense, the court did not sentence defendant on his possession
conviction.  Defendant appeals, arguing the court erred by (1)
denying defendant's motion to quash arrest and suppress evidence,
(2) not inquiring into defendant's pro se claims of ineffective

assistance of counsel, and (3) "sentencing" defendant to three years' mandatory supervised release (MSR) instead of two. We affirm.

## I. BACKGROUND

In October 2008, the McLean County grand jury indicted defendant with (1) unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(d)(i) (West 2008)), a Class 2 felony, and (2) unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2008)), a Class 4 felony. Count I of the two-count indictment alleged defendant knowingly and unlawfully possessed with the intent to deliver a substance containing cocaine. Count II alleged he knowingly and unlawfully possessed less than 15 grams of a substance containing cocaine. The indictment indicated defendant was eligible for mandatory Class X sentencing on count I and extended-term sentencing on count II.

### A. Defendant's Motion To Quash Arrest and Suppress Evidence

In December 2008, defendant filed a motion to quash arrest and suppress evidence. In January 2009, the trial court held a hearing on defendant's motion. Defendant's evidence consisted of the testimonies of Jason Williamson and Jason

- 2 -

Tuttle.

Jason Williamson testified he was working as a police officer with the LeRoy police department on October 17, 2008, when he was approached on the street by Brian Fromhertz. Williamson knew Fromhertz from several prior contacts. Fromhertz had been a suspect, a defendant, or an arrestee on several occasions. From these prior contacts, Williamson knew Fromhertz was a cocaine addict who, because he did not have a driver's license, received drugs through regular deliveries. Fromhertz had told Williamson his dealer lived in Bloomington and delivered drugs to Fromhertz's residence in LeRoy. Williamson testified Fromhertz's assertions his dealer was based in Bloomington had not been confirmed through any investigation.

Fromhertz had not served as an informant before, as far as Williamson knew, but on October 17, 2008, he expressed an interest in setting up a sting. Fromhertz suggested he was going to call his drug dealer and request a cocaine delivery. As Williamson was busy making an arrest when Fromhertz approached him, Williamson asked Fromhertz to discuss it with him later. When Williamson arrived at the police station to continue processing the arrest, Fromhertz was waiting for Williamson there and repeated his suggestion. Again, Williamson told Fromhertz to

- 3 -

wait so they could discuss Fromhertz's proposal later. Approximately 20 or 30 minutes later, Williamson received a phone call from Fromhertz. Fromhertz told Williamson he had called his dealer in Bloomington, who was on the way to LeRoy to deliver drugs to Fromhertz. As Williamson was still processing the arrest, Williamson called Tuttle, a McLean County sheriff's deputy, gave him Fromhertz's phone number, and asked him to address Fromhertz's complaint. Throughout this process, Williamson was unaware of Fromhertz's motives for seeking police intervention in the drug transaction.

Later, after processing the arrest, Williamson was present at Fromhertz's residence when defendant was arrested there. A vehicle had been stopped for suspected involvement in Fromhertz's drug transaction. Williamson spoke with the driver while Tuttle spoke with defendant, who was the front-seat passenger. Although he knew a search of the vehicle was conducted, Williamson could not recall whether any contraband had been found as a result of the search.

After placing the driver under temporary custody, Williamson observed a search of defendant's mouth. Williamson heard Tuttle ask defendant what was in his mouth and observed Tuttle grab defendant to prevent him from swallowing the contents

- 4 -

of his mouth and tell him "to spit it out."  Williamson could not remember Tuttle's physical contact with defendant in detail but observed Tuttle grab defendant and defendant spit out several Baggies of suspected crack cocaine.

On cross-examination, Williamson clarified what he had told Tuttle during their initial phone conversation about Williamson's October 17, 2008, contact with Fromhertz.  Williamson specified he told Tuttle he knew (1) Fromhertz did not have a driver's license and was unable to drive, (2) Fromhertz was a habitual cocaine user, (3) Fromhertz had told LeRoy police he received his cocaine from people in Bloomington, and (4) Fromhertz was expecting a cocaine delivery from those people that evening.

Tuttle testified he was a deputy with the McLean County sheriff's department on October 17, 2008.  Tuttle knew Fromhertz from prior contacts when Fromhertz lived in Bloomington.  Although he did not know Fromhertz was a drug addict, Tuttle knew Fromhertz associated with "those types of people."

On October 17, 2008, Tuttle had a series of phone conversations with Williamson and Fromhertz.  Initially, Williamson called Tuttle and requested him to call Fromhertz about a possible drug transaction with some people from Bloomington.

Williamson did not tell Tuttle Fromhertz had already arranged the delivery. Williamson gave Tuttle Fromhertz's phone number.

Tuttle called Fromhertz. Fromhertz said he had arranged a cocaine delivery, which was in progress. He expected the drugs to be delivered in a vehicle containing a white woman, a white man, and a black man. He said his contact, the white man, went by "T.J." Tuttle testified Fromhertz seemed "pretty scared." Fromhertz told Tuttle he did not have $400 to pay for the drugs being delivered. He expected the delivery to arrive in approximately 15 minutes. Tuttle and another deputy left Bloomington toward LeRoy.

When Tuttle was exiting I-74 in LeRoy, Tuttle received a second call from Fromhertz. Fromhertz said he had just talked to T.J., who said he was exiting I-74 in LeRoy. Tuttle could observe there were only three vehicles exiting I-74 in LeRoy at that time: his car, the other deputy's car, and a third car behind theirs. Tuttle and the other deputy exited toward Fromhertz's residence and pulled into a gas station to allow the third car to pass. When it passed, Tuttle observed there were three people in the car. He identified the driver was a white woman and the front-seat passenger was a black man but could not identify the race or gender of the backseat passenger. Tuttle

and the other deputy followed the car.

Tuttle called Fromhertz with a description of the vehicle.  Tuttle asked Fromhertz whether that was the vehicle Fromhertz expected, but Fromhertz could not say based on the car's description.  Fromhertz told Tuttle if the car parked in the lot behind Fromhertz's apartment building, then it was the correct car.  Tuttle followed the car and observed it park "directly" behind Fromhertz's apartment.  Tuttle parked his car perpendicular to the suspect car with his lights illuminating its passenger compartment.  At that point, Tuttle was able to identify the rear passenger as a white man.  Tuttle testified he was 99% certain the suspect car was the one being used to deliver drugs to Fromhertz.

Tuttle, the other deputy, and Williamson approached the car.  They obtained the names of each person in the car.  The white man in the backseat was named Thomas J. Tillman.  Tuttle began questioning defendant, the front-seat passenger.  Tuttle asked defendant what he and the other people in the car were doing.  Defendant gestured toward Tillman and said they were visiting one of Tillman's friends.  Tuttle asked Tillman what his friend's name was, and Tillman said his friend's name was Brian.

At that point, the officers requested the three people

get out of the car. Defendant was placed in restraints. Tuttle conducted a pat-down search of defendant's person, looking for weapons and "possibly drugs." Tuttle did not find any weapons or drugs on defendant's person. A search of the vehicle was also conducted, but no contraband was found.

Tuttle called Fromhertz to get an identification. Looking from his apartment window, Fromhertz identified Tillman as T.J., his contact. Fromhertz could not recognize either defendant or the driver but reported he knew T.J. was an intermediary between drug purchasers and a black, male drug dealer. Tuttle told Fromhertz the police could not find any drugs on the suspects or in their car and asked him where the cocaine was ordinarily located on their person when he bought it from them. Fromhertz told Tuttle to check the suspects' mouths.

Tuttle approached Tillman first. He shone a flashlight at Tillman's mouth and asked him to open his mouth and lift his tongue. Tillman complied, and Tuttle did not observe any drugs or anything suspicious about the way Tillman performed the test. Tuttle next shone the flashlight at defendant and asked him to open his mouth and lift his tongue. Defendant complied. When he opened his mouth and stuck his tongue out, defendant kept his upper lip tucked under his upper teeth and Tuttle suspected there

- 8 -

was an object behind his upper lip. Defendant was not giving Tuttle a full view of what was in his mouth. Based on his experience performing jail-intake searches, Tuttle recognized defendant's behavior as suspicious of concealing contraband. According to Tuttle, people undergoing this search ordinarily open their mouths wide and expose their upper and lower teeth.

At that point, Tuttle made physical contact with defendant to determine the nature of the object defendant was concealing. Tuttle "pinched" defendant's upper lip with his thumb and forefinger. From the touch, Tuttle "could tell" there was an object there. Tuttle believed the object was contraband. He told defendant "to spit it out." Defendant said, "[O]kay, I'm going to give it to you." He spat out one plastic Baggie containing suspected cocaine. Tuttle could tell there were more objects concealed behind defendant's upper lip. He observed defendant sucking in his cheeks, apparently to "work up enough saliva to swallow" the remaining contents. Tuttle reached out with his pinky finger in an attempt to reach in between defendant's lip and gums to remove the remaining contraband. Defendant jerked away. "[S]omewhat of a struggle" ensued. Eventually, several more Baggies of suspected cocaine were produced from defendant's mouth. Tuttle estimated 15 minutes elapsed from

- 9 -

his initial contact with the suspect vehicle in Fromhertz's parking lot to his discovery of contraband on defendant's person. Although he did not know it when he was searching defendant, sometime later, Tuttle learned defendant had been on MSR, or what used to be known as parole, at the time of these events.

Following the evidence, the trial court heard the parties' arguments on defendant's motion to quash arrest and suppress evidence. Defendant argued Fromhertz's information was not sufficiently reliable to provide police a reasonable, articulable suspicion or probable cause justifying either the initial restriction of defendant's mobility or the search of his mouth resulting in the seizure of contraband. Further, defendant argued the search of defendant's mouth--particularly, the use of force and compulsion in the search--was not justified by defendant's status as a parolee.

The State argued the initial investigatory stop or detention of defendant and the vehicle he occupied were supported by a reasonable suspicion based on Fromhertz's information. Further, the State argued, as a parolee, defendant (1) lacked grounds to challenge the search of his mouth and (2) enjoyed only a limited expectation of privacy such that the search of his mouth need be supported only by a reasonable suspicion, which

Tuttle acquired before conducting the search.  Alternatively, the State contended Tuttle had probable cause to search defendant's mouth based on Fromhertz's information and Tuttle's observation.

The trial court denied defendant's motion to quash arrest and suppress evidence.  The court found the officers initiated a Terry investigation (see Terry v. Ohio, 392 U.S. 1 (1968)) when they approached the suspect vehicle and questioned the passengers.  It concluded this stop was supported by an articulable suspicion the passengers in the car were involved in an ongoing crime based on Fromhertz's information, which the officers independently confirmed by observing the vehicle.  With respect to the search of defendant's person, the court concluded defendant, as a parolee, had a reduced expectation of privacy. Quoting People v. Wilson, 228 Ill. 2d 35, 45, 885 N.E.2d 1033, 1039 (2008), the court stated, "[T]he Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee."  Further, the court concluded whether the officer performing the search has prior knowledge of the parolee's status is irrelevant to the determination of whether a suspicionless search of a parolee is justified.  Based on these findings and conclusions, the court denied defendant's motion to quash arrest and suppress evidence.

## B. Defendant's Pro Se Allegations of Ineffective Assistance of Trial Counsel

Throughout the proceedings against him in this case, on several occasions, defendant raised questions regarding the performance of his trial counsel and his desire either to obtain substitute counsel or to proceed pro se.

On November 21, 2008, after counsel had been appointed for defendant, defendant filed a pro se motion to dismiss. Defendant's motion was addressed that same day at a status hearing. Defense counsel requested the motion be made part of the record but declined to adopt it since he found it was unfounded. The trial court admonished defendant determinations of trial strategy were left to his appointed attorney. Defendant then requested substitution of counsel, claiming a "conflict of interest" with appointed counsel, stating, "We don't agree on anything." The court explained defendant's disagreement with trial counsel did not constitute a conflict of interest and allowed a continuance for defendant to request a different attorney through the public defender's office.

On December 3, 2008, defendant appeared before the trial court for another status hearing. Defense counsel noted defendant's request for a different attorney from the public

defender's office was denied. The court admonished defendant it considered defendant's appointed counsel "very thorough and efficient" and "eminently qualified" to represent defendant in his case. The court gave defendant some time to speak with his attorney. Later, when the court recalled defendant's case and inquired into its status, defense counsel indicated a continuance would possibly be beneficial. Defendant interjected, "I asked you to file a motion to suppress evidence, brother. That's all I asked you." The court set a new status hearing.

On December 5, 2008, a letter from defendant to his attorney was accepted into the trial court file. The letter was dated November 28, 2008, and was notarized on December 2, 2008. In it, defendant requested counsel prepare a motion to suppress and a motion for a "Bill of Particulars."

Also on December 5, 2008, a letter dated December 1, 2008, and notarized December 2, 2008, from defendant to the trial court was filed. In this letter, defendant again requested a substitution of his trial counsel. Defendant referred to counsel's request to incorporate defendant's pro se motion to dismiss into the record in case of an appeal as "criminal." He complained counsel held the opinion a motion to dismiss or a motion to suppress would be unfounded. He asserted the court was able

- 13 -

to "seek the replacement of any attorney whenever you witness the accused['s] rights before the court being infringed upon."  A second copy of this letter was filed on December 9, 2008.

On December 15, 2008, defendant's pro se motion to suppress was filed.  On December 29, 2008, defendant filed a pro se "MOTION OF INEFFECTIVE COUNSEL'S [sic]," again apparently alleging a "conflict of interest" with his appointed counsel.

Also on December 29, 2008, defendant appeared before the trial court for another status hearing.  Defense counsel indicated defendant requested to represent himself.  Defendant clarified he preferred to be represented by a different attorney but, if his options were to represent himself or be represented by his present appointed counsel, he would choose to proceed pro se.  Defendant later stated of his attorney, "[W]e just constantly have a conflict of interest."  When the court asked him whether he meant he disagreed with his attorney's advice, defendant replied, "The only advice he gave me is to cop out."  The court admonished defendant it was familiar with defense counsel's work and knew him to be accomplished, experienced, and capable of representing defendant well.  Defendant stated he wished to proceed pro se "[i]f that's the only way I can get you to grant this motion to suppress."  After defendant again stated his

- 14 -

intention to represent himself, defense counsel explained he had prepared a motion to quash arrest and suppress evidence. He and defendant disagreed as to the basis for a motion to suppress, but counsel believed there were grounds to argue for suppression, and counsel was prepared to file the motion if defendant's request to proceed pro se were withdrawn or denied. Upon counsel's representations, defendant agreed to withdraw his motion to represent himself. Defendant's trial counsel thereafter filed the motion to quash arrest and suppress evidence, the proceedings on which are detailed above.

On March 2, 2009, after a bench trial, the trial court found defendant guilty and set a sentencing hearing for April 17, 2009. Between his conviction and sentencing, several documents drafted by defendant pro se were accepted into the court's file, including a "MOTION OF RECONSIDER GUILTY VERDICK [sic and] NOTICE OF APPEAL," letters to the circuit clerk requesting certain documents be filed and forwarded to the trial judge and the State and requesting copies of trial transcripts, a "MOTION FOR NEW TRIAL," another "NOTICE OF APPEAL," another "MOTION OF RECONSIDER GUILTY VERDICK [sic]," and two letters from defendant to the court, identical copies of one of which were filed March 13, March 17, and March 20, 2009.

In one undated letter to the trial court, file stamped March 27, 2009, and containing a notary public's seal but not her signature, defendant raised several contentions of error involving his representation by appointed counsel.  Defendant claimed the court violated a canon of judicial conduct regarding a defendant's right to be heard by telling defendant it "could not accept any legal documents from [him] because [he] had a [sic] attorney."  Defendant complained the court "knew" he and his attorney "was [sic] not seeing eye to eye through[]out the duration of this proceeding, yet *** still refused to accept legal document [sic] from [him] that can lawfully prove [his] innocence."  Defendant further asserted the court violated a canon of judicial conduct requiring judges to "be faithful to the law and maintain professional competence in it" and "be unswayed by partisan interests, public clamor, or fear of criticism."  With respect to this alleged violation, defendant stated,

"My attorney *** did not even attempt to defende [sic] me.  You and I both know that for if he did I'll [sic] be at home with my wife right now instead of here pleading my case to you.  If he would of [sic] done the paper[]work like I lawfully requested of him

you would of [sic] looked at them, but

becouse [sic] he did not you would not even

look at the facts and evidence of this case."

Defendant also claimed the court violated a canon requiring a judge with knowledge of a violation of the judicial canons or the rules of lawyer ethics to initiate disciplinary matters. Defendant claimed his attorney "was not trying to do anything for [him] and this is irrefutable of [sic] the record." "You just continue to be bias [sic] toward me," defendant wrote the court, "by ignore [sic] me and saying [defense counsel] is a good attorney."

On April 17, 2009, the trial court held a sentencing hearing. The court noted defendant's pro se filings. The court stated it had reviewed the filings "simply to see what they were" but had not "read through all of them." The court asked defense counsel whether he planned to adopt any of them. Defense counsel requested the documents titled as notices of appeal or motions for reconsideration of the verdict be ignored. Counsel adopted defendant's March 17, 2009, "MOTION FOR NEW TRIAL" and the accompanying copy of defendant's letter to the court filed that same day, which counsel believed presented an independent basis for a new trial. After arguments based on these adopted pro se

- 17 -

filings requesting a new trial, the court denied defendant's motion, noting it had considered all of the arguments contained in the documents, some of which counsel had not specifically addressed.  The court proceeded to sentencing.

On April 21, 2009, defendant's attorney filed a motion to reconsider sentence, asserting the sentence was excessive.  On August 7, 2009, the trial court held a hearing on defendant's motion.  Following arguments, the court denied defendant's motion and admonished defendant of his appellate rights.  On defendant's behalf, the court ordered a notice of appeal be prepared and appointed the office of the State Appellate Defender (OSAD) as counsel on appeal.  When the court asked defendant whether he had any questions about the appellate process, defendant requested a continuance of posttrial procedures and asked the court to dismiss his attorney and appoint new counsel "to prepare [his] post-trial motions and raise issues for the Appellate Court." The court clarified OSAD would be defendant's attorney for the remainder of proceedings and would advise him going forward.

## C. Trial and Sentencing

On February 6 and March 2, 2009, defendant was tried in a two-day bench trial.  The evidence consisted of testimony by Williamson, LeRoy police officer Nathan Wilkins, McLean County

sheriff's department detective Tim Tyler, forensic scientist Joni Little, McLean County sheriff's deputy Joe Reidy, Tillman, Fromhertz, and Tuttle. Defendant elected not to testify and did not present any evidence on his behalf. Following evidence and arguments, the trial court found defendant guilty of both counts charged in the indictment, unlawful possession of a controlled substance with intent to deliver and unlawful possession of a controlled substance.

On April 17, 2009, the trial court sentenced defendant. A presentence investigation report was admitted as evidence. Four letters were admitted as evidence at defendant's behest. The court considered the evidence and the parties' recommendations. It noted defendant was eligible for mandatory Class X sentencing on his possession-with-intent-to-deliver conviction. It found the possession conviction was for a lesser included offense and, as such, did not warrant sentencing. It sentenced defendant to 12 years' imprisonment. On its written sentencing judgment, the court indicated defendant would be required to serve three years of MSR following his prison term.

On August 7, 2009, following a hearing, the trial court denied defendant's motion to reconsider sentence.

This appeal followed.

- 19 -

Defendant raises three issues on appeal: (1) whether the trial court erred by denying defendant's motion to quash arrest and suppress evidence, (2) whether the court erred by failing to inquire into defendant's posttrial pro se claims of ineffective assistance of counsel, and (3) whether the court erred by "sentencing" defendant to three years' MSR instead of two. We consider each argument in turn.

## A. Suppression of Evidence

First, defendant contends the trial court erred by denying his motion to quash arrest and suppress evidence. Specifically, defendant argues the initial detention and investigation of defendant were not supported by a reasonable, articulable suspicion and the search of defendant's person was not supported by probable cause. Further, defendant argues the search was not justified by defendant's status as parolee as the officer performing the search did not know defendant was on MSR at the time of the search. The State responds the initial detention was justified because Fromhertz's information gave officers a reasonable, articulable suspicion defendant was involved in an ongoing crime. Further, the State maintains defendant, as a parolee, enjoyed a lower expectation of privacy

such that only a reasonable suspicion was needed to justify the search of defendant's person. Alternatively, the State contends the seizure of contraband was made pursuant to a lawful search incident to arrest which, in turn, was supported by probable cause based on Fromhertz's verified information. We conclude the search in which the evidence defendant seeks to suppress was seized was permissible.

### 1. The Fourth Amendment and Terry

The fourth amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated***." U.S. Const., amend. IV; see also Ill. Const. 1970, art. I, §6 ("The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches[ and] seizures***."). This amendment applies to the states through the due-process clause of the fourteenth amendment. Wilson, 228 Ill. 2d at 40, 885 N.E.2d at 1037. The fourth-amendment right exists "wherever an individual may harbor a reasonable 'expectation of privacy' [citation]." Terry, 392 U.S. at 9. The fourth amendment applies to all seizures of a person, even those involving only a brief detention. People v. Thomas, 198 Ill. 2d 103, 108, 759 N.E.2d

- 21 -

899, 902 (2001).

The specific incidents of the fourth amendment "must be shaped by the context in which it is asserted. For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." (Internal quotation marks omitted.) Terry, 392 U.S. at 9. "Reasonableness under the fourth amendment generally requires a warrant supported by probable cause." Thomas, 198 Ill. 2d at 108, 759 N.E.2d at 902. In Terry, however, the United States Supreme Court recognized an exception to the warrant requirement for brief investigatory detentions in certain circumstances. Id. at 108-09, 759 N.E.2d at 902. Under Terry, "a police officer may briefly stop a person for temporary questioning if the officer reasonably believes that the person has committed, or is about to commit, a crime." Id. at 109, 759 N.E.2d at 902. Determining whether such a stop is reasonable under the fourth amendment involves a dual inquiry; a court must assess "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20.

### 2. Initial Detention

In this case, the parties initially dispute whether

Fromhertz's information provided a sufficient basis for the police to detain defendant.  We agree with the State the initial contact between law-enforcement authorities and defendant did not constitute an unreasonable seizure.

First, we must consider whether and when defendant was seized within the meaning of the fourth amendment "[f]or if there was no seizure, then the fourth amendment was not implicated at that point."  Thomas, 198 Ill. 2d at 111, 759 N.E.2d at 903.  Both parties assert defendant was seized when police officers approached the vehicle defendant occupied and began questioning defendant and the driver.  We agree.  "A seizure occurs when, by physical force or a show of authority, a police officer limits a citizen's liberty. [Citation.]  More plainly, a police officer 'seizes' a person when he or she accosts that person and denies that person the freedom to walk away."  People v. Leggions, 382 Ill. App. 3d 1129, 1132, 890 N.E.2d 700, 704 (2008).  Here, a reasonable person in defendant's position would have felt he lacked the freedom to discontinue contact with the police when two squad cars blocked the vehicle in which defendant sat and two officers positioned themselves on either side of the car and engaged the passengers in an investigatory conversation.  This encounter was akin to a traffic stop, which constitutes a seizure

for fourth-amendment purposes.  People v. Bunch, 207 Ill. 2d 7, 13-14, 796 N.E.2d 1024, 1029 (2003).

Next, we must determine whether this seizure was reasonable.  Under Terry, a brief investigatory detention is justified at its inception if the police officer effecting the stop can "point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion."  Thomas, 198 Ill. 2d at 109, 759 N.E.2d at 902. The Supreme Court of Illinois has provided further guidance about Terry stops, as follows:

> "We have previously held that a totality-of-circumstances approach will achieve a fairer balance between public and private interests. [Citation.]  The central issue is *** whether the information, taken in its totality, and interpreted not by technical legal rules but by factual and practical commonsense consid-erations, would lead a reasonable and prudent person to believe that the person stopped had committed an offense."  (Internal quotation marks omitted.)  People v. Ledesma, 206 Ill. 2d 571, 583, 795 N.E.2d 253, 262 (2003),

overruled on other grounds by People v.

Pitman, 211 Ill. 2d 502, 813 N.E.2d 93

(2004).

Further, the supreme court has stated:

"Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly. The facts supporting the officer's suspicions need not meet probable cause requirements, but they must justify more than a mere hunch. The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." Thomas, 198 Ill. 2d at 110, 759 N.E.2d at 903.

"In evaluating whether reasonable suspicion exists, a court should objectively consider whether the information known to the officer at the time of the stop would warrant a person of reasonable caution to believe a stop was necessary to investigate the possibility of criminal activity." (Internal quotation marks

omitted.) People v. Shafer, 372 Ill. App. 3d 1044, 1048-49, 868 N.E.2d 359, 362 (2007).

Here, the parties dispute whether the information provided by Fromhertz gave rise to reasonable suspicion justifying a Terry stop. In evaluating whether a stop is warranted, a court "should consider the quality and content of information known to officers as well as the reliability of the source of the information." (Internal quotation marks omitted.) Id. at 1049, 868 N.E.2d at 362. Information provided to police by a third-party informant may give rise to reasonable suspicion "if the information is reliable and allows an officer to reasonably infer that a person was involved in criminal activity." (Internal quotation marks omitted.) Id. at 1049, 868 N.E.2d at 362-63. "In determining whether an informant's statements provide sufficient basis for a Terry stop, a reviewing court should consider the informant's veracity, reliability, and basis of knowledge." People v. Sparks, 315 Ill. App. 3d 786, 792, 734 N.E.2d 216, 221 (2000).

Not all informants' tips merit the same treatment as "tips may vary greatly in their value and reliability and *** one simple rule will not cover every situation." In re J.J., 183 Ill. App. 3d 381, 385, 539 N.E.2d 764, 766 (1989); see also id.

- 26 -

at 385-86, 539 N.E.2d at 766 ("Where some tips, completely lacking in indicia of reliability, would warrant either no police response or require further investigation before a stop would be justified, other situations, such as when a victim of a crime seeks immediate police aid and describes his assailant or when a credible informant warns of a specific impending crime, would justify the police making an appropriate response.").

Courts in Illinois have noted various indicia of reliability for evaluating informants' tips although, due to the commonsense nature of the inquiry, no list of such indicia can be exhaustive. "[C]ourts may give greater weight to information provided by an eyewitness or victim of a crime than they would to information provided by persons who do not fall into those categories." Shafer, 372 Ill. App. 3d at 1049, 868 N.E.2d at 363; see also id. ("a strong inference that a person is a direct witness to the offense is more indicative of reliability than a weak inference that the tipster had a source of inside information"). Information is more credible if the informant implicates himself in the criminal activity he is reporting. Sparks, 315 Ill. App. 3d at 794, 734 N.E.2d at 223. Information from an informant whose identity is known to police and who is available for cross-examination is generally more credible than an anony-

mous tip or one from a confidential source. See Shafer, 372 Ill. App. 3d at 1050, 868 N.E.2d at 364 (discussing the enhanced reliability of tips made to police emergency numbers, which "are not truly anonymous even when [the callers] fail to identify themselves by name" (internal quotation marks omitted)); id. at 1050-51, 868 N.E.2d at 364 (noting criminal liability for making false reports to police "lends reliability to" information obtained from identifiable informants (internal quotation marks omitted) (quoting Florida v. J.L., 529 U.S. 266, 276 (2000) (Kennedy, J., concurring joined by Rehnquist, CJ.))); cf. Sparks, 315 Ill. App. 3d at 795, 734 N.E.2d at 223 (finding officers' knowledge of a confidential informant's identity was not an indicum of reliability as the informant's identity was not made known to the defendant and the informant would not be subjected to cross-examination). A tip providing predictive information and readily observable details will be deemed more reliable if these are confirmed or corroborated by the police. See, e.g., Alabama v. White, 496 U.S. 325, 331-32 (1990) (finding significant aspects of the informant's story, especially those predicting the defendant's future behavior, were sufficiently corroborated by the police to furnish reasonable suspicion); cf. J.L., 529 U.S. at 271 ("The anonymous call *** provided no predictive

information and therefore left the police without means to test the informant's knowledge or credibility.").

Under the totality of the circumstances of this case, Fromhertz's tip and the investigatory steps taken by police were sufficient to justify defendant's detention in its inception. Police obtained a reasonable suspicion of defendant's involvement in an ongoing crime from several particularly relevant circumstances. First, Williamson and Tuttle knew Fromhertz from prior contacts. Although he had not served as an informant and his veracity had not been tested in such a context before, Fromhertz's veracity could be at least minimally measured insofar as the information provided in this case was consistent with information he had told Williamson in the past and information known by Williamson and Tuttle based on their own observations. Williamson was aware of Fromhertz's cocaine addiction prior to October 17, 2008, and Fromhertz had told him he obtained drugs from people in Bloomington. Tuttle knew Fromhertz used to live in Bloomington. Thus, Tuttle and Williamson could verify Fromhertz's report he was buying drugs from a person traveling from Bloomington was consistent with what they already knew about him. Although Fromhertz's earlier statement his cocaine dealer was based in Bloomington had not been independently investigated

or confirmed, the consistency of his statements gave Williamson and Tuttle some indication of his veracity as an informant. Cf. Sparks, 315 Ill. App. 3d at 794, 734 N.E.2d at 223 (concluding, since the informant had not been used as such before, the police officer effecting the Terry stop "could not accurately judge the informant's veracity").

Second, Fromhertz's identity was known to Williamson and Tuttle and was never concealed from defendant. This case is therefore distinguishable from cases involving anonymous tips and confidential sources, where greater indicia of reliability are required for a tip to supply reasonable suspicion. Indeed, Williamson and Tuttle identified Fromhertz as the source of their information at the suppression hearing and, later, Fromhertz testified at defendant's trial and defendant cross-examined him.

Third, Fromhertz identified the basis of his information in his initial contacts with Williamson, stating he himself was going to be involved in a drug transaction. The identification of the basis of information is significant in itself. Further, Fromhertz's implication of himself in the crime he was reporting lends reliability to his information.

Fourth, the remarkable circumstances of Fromhertz's tip demanded immediate police involvement. The crime Fromhertz

- 30 -

reported was expected to occur within approximately 15 minutes of his initial contact with Tuttle, who was approximately 15 minutes away from the site of the drug transaction. Further, Fromhertz was potentially in personal danger if Tuttle was unable to intervene; Fromhertz sounded noticeably afraid when they spoke, and a violent confrontation was possible if his dealer became aware Fromhertz did not intend to pay for the drugs and had sought intervention by the police. Needless to say, Fromhertz's proposed sting created a unique situation "so far from the ordinary that any competent officer would be expected to act quickly." Thomas, 198 Ill. 2d at 110, 759 N.E.2d at 903.

Fifth, Fromhertz provided Williamson and Tuttle with detailed predictive information, which they confirmed before detaining defendant and which indicated his possession of inside information. This predictive information included the race, gender, and number of occupants of a car traveling from Bloomington in the direction of LeRoy at a specific approximate time, the precise location of the car at the I-74 exit at a specific time, and the car's destination in the parking lot at Fromhertz's apartment building. All of these details were confirmed by police before they initiated the Terry stop. Tuttle's identification of the suspect vehicle immediately after

- 31 -

Fromhertz reported its location based on a phone conversation with one of its occupants is particularly indicative of the reliability of Fromhertz's information. Through these corroborated predictive details, Fromhertz demonstrated he had inside information about the criminal activity he was reporting.

Under these circumstances, defendant's detention was supported by a reasonable suspicion of his involvement in an ongoing crime.

### 3. Scope of Investigation & Probable Cause

Defendant argues, even if defendant's seizure was reasonable in its inception, the search resulting in the discovery of contraband exceeded the scope of any permissible investigation under Terry. As the officers who effected the Terry stop obtained probable cause to arrest defendant during the permissible course of their investigation, we conclude the search of defendant's mouth was permissible.

The second inquiry under Terry is whether the police activity in question "was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20. This requires us to consider "the length of the detention and the manner in which it was carried out." (Emphases omitted.) Bunch, 207 Ill. 2d at 14, 796

- 32 -

N.E.2d at 1029.  "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, and the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." (Internal quotation marks omitted.)  Id.  Generally, while a pat-down search or frisk of the detainee to detect concealed weapons is permissible where an officer has reason to believe the detainee is armed and dangerous, a search for evidence during a Terry stop violates the fourth amendment.  People v. Galvin, 127 Ill. 2d 153, 170, 535 N.E.2d 837, 845 (1989).

Defendant contends the search of his mouth exceeded the limited scope of a Terry stop.  The State responds the officers obtained probable cause to arrest defendant during the course of their investigation and the subsequent search was a permissible search incident to arrest.  As we conclude the search of defendant's mouth was an allowable search incident to an arrest which was, in turn, supported by probable cause developed within the permissible scope of the Terry stop, we need not consider defendant's argument the search was impermissible under a Terry analysis.

"In order to make a valid, warrantless arrest, a police

officer must have probable cause to arrest."  People v. Love, 199 Ill. 2d 269, 278, 769 N.E.2d 10, 16 (2002).  "Probable cause exists for an arrest when the totality of the facts and circumstances known to the officers is such that a reasonably prudent person would believe that the suspect is committing or has committed a crime."  In re D.W., 341 Ill. App. 3d 517, 523, 793 N.E.2d 46, 51 (2003).  Though a higher standard than reasonable suspicion (Leggions, 382 Ill. App. 3d at 1133, 890 N.E.2d at 705), probable cause does not require evidence sufficient to convict (People v. Foster, 119 Ill. 2d 69, 83, 518 N.E.2d 82, 87 (1987)).  As with reasonable suspicion, whether probable cause to arrest exists is a practical, commonsense determination.  As the supreme court observed in People v. Cabrera, 116 Ill. 2d 474, 485, 508 N.E.2d 708, 712 (1987):

> "The courts, in striking a balance between
> the need to protect citizens from invasions
> of their privacy at the whim of police
> officers and the countervailing need to allow
> leeway for efficient enforcement of the laws,
> are sensitive to the fact that policemen must
> often make their decisions to arrest or not
> to arrest under ambiguous circumstances and

must exercise their judgment, at the risk of making a mistake. In dealing with probable cause, *** as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." (Internal quotation marks omitted.)

Like reasonable suspicion in the Terry context, probable cause can be established as the result of an informant's tip and verification of the tip by police. D.W., 341 Ill. App. 3d at 523, 793 N.E.2d at 51. The considerations for evaluating an informant's tip in the context of probable cause are the same as in the context of reasonable suspicion. See id. ("The informant's veracity, reliability and basis of knowledge are determinative. [Citation.] One indicium of reliability of information exists when the facts learned through police investigation independently verify a substantial part of the informant's tip.").

In this case, the totality of the circumstances indicates officers developed probable cause to arrest defendant during the course of their Terry investigation. The scope of the

investigation in this case expanded naturally and reasonably in response to the information the officers lawfully obtained. When they initiated defendant's detention, Tuttle and Williamson obtained the identities of the occupants in the suspect vehicle, verifying the backseat passenger's initials, race, and sex were those of Fromhertz's contact, T.J. When questioned, defendant indicated the occupants' purpose at the apartment building where they stopped was to visit Tillman's friend. Tillman subsequently verified the first name of the friend they were visiting was Brian, Fromhertz's first name. At that point, the officers ordered the occupants to exit the vehicle and defendant was placed in hand restraints. Both these steps are permissible as a matter of course during a Terry stop of a vehicle. See Leggions, 382 Ill. App. 3d at 1133, 890 N.E.2d at 705 (finding the police may, as a matter of course, order the occupants out of a vehicle once it is lawfully stopped and the nature of the investigatory stop is not affected merely by virtue of an officer's using handcuffs). Further, by the time Tuttle conducted the search of defendant's mouth, Fromhertz had positively identified Tillman as his drug contact, clarified Tillman's role as an intermediary in their drug transactions between himself and a black, male drug dealer, and indicated he regularly observed drug dealers conceal

drugs in their mouths. The latter information helped explain why the preceding searches had not resulted in detection of the drugs being delivered.

At least following Tuttle's final conversation with Fromhertz, which occurred less than 15 minutes after police initiated contact with defendant, considering the totality of the circumstances, a reasonable person in Tuttle's position would have been justified in the belief defendant was probably committing a crime. As the investigation was reasonable in both duration and scope of inquiry, we hold the officers developed probable cause to arrest defendant in the permissible course of the Terry stop. Accordingly, we hold the search of defendant's mouth resulting in the seizure of the evidence defendant sought to suppress was a valid search incident to his arrest. See People v. Bailey, 159 Ill. 2d 498, 503, 639 N.E.2d 1278, 1280 (1994) ("It is reasonable for police to search the arrestee *** for evidence that the arrestee could conceal or destroy."). As we conclude the search and seizure were valid under traditional fourth-amendment principles, we need not consider the effects of defendant's status as a parolee on the suppression of evidence.

B. Defendant's Posttrial Allegations of
Ineffective Assistance of Counsel

Next, defendant argues the trial court erred by not inquiring into defendant's posttrial pro se complaints of ineffective assistance of trial counsel. Specifically, defendant claims he was entitled to some inquiry by the court into the allegations contained in the undated letter filed on March 27, 2009. Defendant argues the court's failure in this regard violated People v. Krankel, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), and its progeny. We disagree.

In Krankel, 102 Ill. 2d at 187-88, 464 N.E.2d at 1048, the defendant filed a posttrial pro se motion for a new trial alleging ineffective assistance of trial counsel, and the trial court denied his request for new counsel to assist him in arguing his motion. The supreme court, on the recommendation of both parties on appeal, remanded the case for a new hearing on the motion, at which the defendant was entitled to new counsel. Id. at 189, 464 N.E.2d at 1049; see also People v. Moore, 207 Ill. 2d 68, 77-79, 797 N.E.2d 631, 637-38 (2003) (discussing and applying Krankel and the rules derived therefrom).

New counsel is not automatically required when a defendant files a pro se posttrial motion alleging ineffective assistance of counsel; rather, "the operative concern for the reviewing court is whether the trial court conducted an adequate

- 38 -

inquiry into the pro se defendant's allegations of ineffective assistance of counsel."  People v. Johnson, 159 Ill. 2d 97, 125, 636 N.E.2d 485, 497 (1994).  "A court can conduct such an inquiry in one or more of the following three ways: (1) questioning the trial counsel, (2) questioning the defendant, and (3) relying on its own knowledge of the trial counsel's performance in the trial."  People v. Peacock, 359 Ill. App. 3d 326, 339, 833 N.E.2d 396, 407 (2005).  Where the claim lacks merit or pertains to matters of trial strategy, new counsel need not be appointed. People v. Crane, 145 Ill. 2d 520, 533, 585 N.E.2d 99, 105 (1991). Further, a defendant who fails to bring such a claim to the trial court's attention forfeits it notwithstanding having presented it in a letter to the court.  See People v. Lewis, 165 Ill. App. 3d 97, 109, 518 N.E.2d 741, 749 (1988) ("It would also appear[] *** that the trial judge, defendant's counsel, and the State were all unaware of defendant's letter as no mention was made of it, and defendant did not himself refer to it ***. [Citation.]  Thus, defendant did not pursue the matter contained in his letter and[] *** waived any issue in this regard on appeal.").

Here, as in Lewis, defendant failed to raise his March 27, 2009, claims of ineffective assistance of trial counsel before the trial court in subsequent appearances--namely, his

April 17, 2009, sentencing hearing and the August 7, 2009, hearing on his motion to reconsider sentence--despite being present with defense counsel. Defendant thereby forfeited these claims. See id. ("While the trial judge may, in some instances, have a responsibility to act on letters mailed by a defendant to the court, here, defendant subsequently appeared in court with counsel and could have properly presented any matter to the court.").

Moreover, were we to consider defendant's argument, we would find it unpersuasive. Defendant's letter filed on March 27, 2009, raised two complaints with trial counsel's performance. First, defendant complains he and his attorney did not "see eye to eye," apparently referring to defendant's earlier complaints regarding counsel's decision not to file a motion to dismiss or a motion for a "Bill of Particulars." However, this alone would not support an ineffective-assistance claim as matters of trial strategy are left to counsel. See Crane, 145 Ill. 2d at 533, 585 N.E.2d at 105 (holding no Krankel hearing is required when a defendant's underlying claim is related to a matter of trial tactics). Further, defendant repeatedly complained of disagreements between himself and his attorney. By the time defendant raised this issue in his posttrial letter, the court

- 40 -

observed defendant's concerns were addressed when (1) the court granted defendant a continuance to allow him to apply for new counsel through the public defender's office and (2) defense counsel filed a motion to suppress as requested by defendant. The court's own knowledge of these complaints and the attempts by itself and defense counsel to resolve them would have satisfied any inquiry into this claim which may have been required by defendant's letter.

Second, defendant alleges a complete failure on counsel's part to present a defense. This is clearly refuted by the record on appeal, which shows defense counsel demonstrated competence and diligence in, among other things, (1) preparing and arguing pretrial and posttrial motions, (2) preserving objections and arguments for appeal, (3) presenting opening and closing arguments, (4) cross-examining the State's witnesses, and (5) reasonably accommodating defendant's preference for obtaining substitute counsel. Thus, the trial court's observation of counsel's performance throughout the proceedings would have satisfied any inquiry into this claim which may have been required by defendant's posttrial letter to the court.

C. Class X Sentencing for Lesser Felonies and MSR

Finally, defendant argues the trial court erred by

- 41 -

"sentencing" him to the three-year MSR term provided for a Class X offense (see 730 ILCS 5/5-8-1(d)(1) (West 2008)). Specifically, defendant maintains he should instead be required to serve the two-year MSR term for Class 2 felonies (see 730 ILCS 5/5-8-1(d)(2) (West 2008)) despite receiving a Class X sentence as a recidivist. Defendant argues this result is required by a plain reading of the MSR statute (730 ILCS 5/5-8-1(d) (West 2008)) or, alternatively, by the doctrine of lenity. This court has rejected these arguments in People v. Smart, 311 Ill. App. 3d 415, 418, 723 N.E.2d 1246, 1248 (2000), and People v. Lee, 397 Ill. App. 3d 1067, 1069-72, 926 N.E.2d 402, 404-06 (2010), respectively. We decline defendant's invitation to revisit this court's holdings in Smart and Lee. Accordingly, we hold the court did not err by imposing the MSR term provided for a Class X offense when it sentenced defendant as a Class X offender.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment. As part of our judgment, we award the State its $50 statutory assessment as costs of this appeal.

Affirmed.