NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180259-U

NO. 4-18-0259

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 22, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| JAYLAND DONALDSON, | ) | No. 17CF261 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not err by sentencing defendant to an aggregate 12-year term of imprisonment.

(2) Defendant forfeited his posttrial *pro se* claims of ineffective assistance of counsel by failing to bring them to the trial court's attention.

¶ 2    Following a bench trial, the trial court found defendant, Jayland Donaldson, guilty of three counts of unlawful delivery of a controlled substance (720 ILCS 570/401(c)(2), (d)(i) (West 2016); *id.* § 407(b)(1), (2)) and two counts of unlawful possession with intent to deliver a controlled substance (*id.* § 401(c)(2), *id.* § 407(b)(1); 720 ILCS 550/5(c) (West 2016)) and sentenced him to an aggregate term of 12 years in prison. Defendant appeals, arguing the court erred by (1) considering improper aggravating factors at sentencing and imposing an excessive sentence and (2) failing to inquire into his posttrial *pro se* claims of ineffective assistance of

counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          In August 2017, the State charged defendant with multiple drug-related offenses, including three counts of unlawful delivery of a controlled substance (720 ILCS 570/401(c)(2), (d)(i) (West 2016); *id.* § 407(b)(1), (2)) (counts I, II, and III); two counts of unlawful possession of a controlled substance with intent to deliver ((*id.* § 401(c)(2), *id.* § 407(b)(1); 720 ILCS 550/5(c) (West 2016)) (counts IV and VI); and one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2016)) (count V). The charges were based on allegations that, on three occasions in August 2017, defendant sold cocaine to a confidential source during controlled drug buys that occurred within 1000 feet of public housing; possessed with the intent to deliver more than a gram of cocaine within 1000 feet of public housing; possessed with the intent to deliver more than 10 grams but less than 30 grams of a substance containing cannabis; and unlawfully possessed a substance containing hydrocodone.

¶ 5          In December 2017 and January 2018, defendant's bench trial was conducted. The State's evidence showed that in August 2017, William Spandet agreed to work as a confidential source for the police, specifically Sergeant Jeff Hamilton with the Livingston County Proactive Unit. On August 8, 19, and 22, 2017, Spandet purchased cocaine from defendant during three controlled drug buys. An unspecified amount of cocaine was sold during the first buy and 2.1 grams and 1.9 grams of cocaine were sold during the second and third buys, respectively. Each buy occurred in Spandet's vehicle while it was parked within an approximate 50-foot range of Meadowview Court, a public housing complex where defendant resided. Regarding how the location of the controlled buys was chosen, Hamilton testified as follows:

          "The first buy the confidential source was directed to meet out there in front

of the parking lot. The second and third buy I believe [defendant] himself directed the confidential source to park in the same general area. I think on the third time specifically [defendant] told the confidential source to park a little bit further down the street out of the way of the cameras of the housing complex."

¶ 6        Spandet testified he was told to call Hamilton when he learned of the potential to buy drugs in Livingston County. He identified defendant as the person who sold him drugs on three occasions in August 2017. At the time of the first transaction, Spandet knew he had the potential to buy drugs from either an individual named Chad Callahan or defendant.

¶ 7        The record shows the State presented audio recordings of the first two drug buys, which were obtained using a recording device given to Spandet. It also presented surveillance videos captured by the police of the second and third controlled buys. The audio recording of the first buy indicates Spandet spoke with an individual other than defendant before ultimately meeting with defendant and purchasing cocaine. At the conclusion of the controlled buy, Spandet asked if he could do business with defendant again and defendant replied "anytime." Upon request, defendant provided his phone number to Spandet and identified himself as "Jay." Defendant also stated as follows: "If you keep f*** with me, a g[ram] is gonna be 80 bucks for you, bro." After defendant exited the vehicle, Spandet used a racial slur to describe defendant's appearance.

¶ 8        Spandet testified that prior to the second controlled buy, defendant stated he would sell Spandet an "eight-ball" but then later expressed that he did not have enough cocaine for an "eight-ball." As a result, Spandet brought a scale to his meeting with defendant, which was used during the drug transaction. An audio recording of the second buy reflects defendant expressed that he wanted a similar scale for himself.

¶ 9        The same date as the third and final controlled buy, the police executed a search

warrant on defendant's apartment at the Meadowview Court complex. During the search, the police located 12.4 grams of cannabis in a cabinet under the kitchen sink; 3.1 grams of "bagged up" cocaine in a backpack in the living room; 1.2 grams of cocaine inside a "fake tomato paste container"; a digital scale; empty "baggies"; and currency used during the August 22 controlled buy.

¶ 10    The State's evidence further showed that Hamilton interviewed defendant after the execution of the search warrant. A recording of the interview was admitted into evidence and played for the trial court. During the interview, defendant acknowledged that the police would find cannabis, cocaine, a scale, and sandwich bags in his residence. He also admitted that the cocaine found in the fake tomato paste container belonged to him and that the phone number contacted during the controlled buys was his number. However, defendant asserted the backpack found in his residence belonged to an individual named Heather Osmolski, who was at the residence when it was searched. Hamilton testified that in addition to cocaine, the backpack also contained a digital scale.

¶ 11    During the recorded interview with Hamilton, defendant further asserted that he "just started" selling cocaine and was not selling "that much." When Hamilton asked if defendant was selling "a couple of grams a day," defendant agreed, stating he sold cocaine "to make a little money." Defendant stated he charged $80 for a gram of cocaine and estimated that he had been selling cocaine for around "two weeks." He acknowledged selling cannabis "on and off" since he was "younger."

¶ 12    Defendant testified on his own behalf, stating he was 19 years old. He asserted that the backpack found in his apartment belonged to Osmolski and that nothing in the backpack was his. Defendant acknowledged selling drugs to Spandet during the controlled drug buys. He also

admitted that the cocaine found in the fake tomato paste container was his but maintained that it was for his own "personal use" and not for sale. Defendant testified that he was addicted to cocaine. He stated he would purchase "an eight ball," which weighed 3.5 grams and try to "make it last through the week." According to defendant he "never had really" sold cocaine "until [he] was brought upon [*sic*] somebody that said they wanted some; and that was Spandet." He asserted Spandet was the only person he sold drugs to and that Spandet always called him.

¶ 13        On cross-examination, defendant testified he obtained the cocaine he sold from a man in Joliet named "Tank." He asserted he "just started messing around with cocaine in August." When asked whether he was selling cannabis before that, defendant respondent "[n]ot really" and that he "was smoking it." However, he also agreed that he was "dealing *** weed *** off and on since [he] was a kid." Defendant stated he was not employed and obtained money to buy drugs from his girlfriend.

¶ 14        Ultimately, the trial court found defendant guilty of each charged offense except count V, which charged him with unlawful possession of hydrocodone. The court found the evidence was overwhelming regarding defendant's participation in the three controlled drug buys involving Spandet. It also determined it was "highly unlikely" that those were the only times defendant had ever sold drugs and further stated as follows: "The evidence is pretty compelling that you were engaging in a drug operation. Now maybe it was early on in the drug operation. I don't know. But I do think it's unlikely particularly since you admitted selling the marijuana for years."

¶ 15        Defendant did not file a posttrial motion and in February 2018, the trial court conducted his sentencing hearing. Defendant's presentence investigation (PSI) report showed he was born in June 1998. He had a history of delinquency that involved adjudications for disorderly

conduct while armed in 2012, for which he was sentenced to a term of probation that was successfully terminated in May 2013; criminal damage to property in 2013, for which he was sentenced to a term of probation that was successfully terminated in June 2014; battery and possession of cannabis in March 2015, for which he was sentenced to a term of probation until his 21st birthday; home invasion and aggravated battery in February 2015, for which he was sentenced to a term of probation until his twenty-first birthday; and aggravated battery in October 2016, for which he was sentenced to 30 months' probation beginning in December 2016.

¶ 16    The PSI report also showed defendant grew up in a home with his mother and his mother's boyfriend. He described his childhood as "a little rough" but reported having a good relationship with both his mother and her boyfriend. Defendant had no relationship with his biological father, who was incarcerated when defendant was three months old.

¶ 17    At the time of the underlying offenses, defendant resided with his girlfriend, Kira Smith, and their two children, ages three years and six months. Defendant was also the father of two other children: a three-year-old daughter who resided with her mother in Wisconsin and an infant son who resided with his mother in Pontiac, Illinois.

¶ 18    In May 2016, defendant graduated from high school. He reported being currently unemployed and that Smith supported him financially. In the past, defendant worked for McDonald's, Exact Packaging, and Wal-Mart. His longest period of employment was with Wal-Mart for six months. Defendant stated he was fired from that job for failing a drug test.

¶ 19    Regarding his history of drug use, defendant reported that he began smoking cannabis at age 10 and, by age 12, was using cannabis daily. According to defendant, he last used cannabis in August 2017. At that time "he was smoking daily and would smoke throughout the day," costing him approximately $100 per day. Defendant stated he began using cocaine in June

- 6 -

2017, at the age of 19, after his grandmother died. He asserted "he needed something to help him relax from the anger he was experiencing." Defendant reported daily use of one to two grams of cocaine, which cost him approximately $150 per day. Finally, defendant admitted that he had a history of abusing prescription drugs. Although the report states his last use of prescription drugs was in June 2016, defendant also claimed that "[h]e would use Xanax to come down off of his cocaine use," which he asserted did not begin until 2017.

¶ 20 Defendant acknowledged having a problem with drugs. He asserted he had "trouble dealing with anxiety and anger" and self-medicated with drugs to calm himself down. He believed he had "an addictive personality" and that substance-abuse treatment would help him. According to the PSI report, defendant asserted the underlying offenses were the result of him "supporting his drug addiction" and that he felt "depressed and remorseful about what he [had done]." He also provided a written statement in which he expressed remorse and reiterated that he had only been "thinking about supporting [his drug] habits." Defendant expressed that he wanted help, "to change for the better," to further his education and become a welder, and to be a part of his children's lives.

¶ 21 Finally, the PSI report shows defendant's juvenile probation officer reported the following regarding defendant's conduct while on probation:

> "[Defendant] has never stopped using drugs while on [p]robation. He also did not cooperate with substance abuse counseling and mental health counseling. He has had a few jobs during the term of [p]robation, but he was not able to keep a job for very long. In addition, he constantly lies about work, counseling, and drug use."

¶ 22 The record reflects that although defendant was not eligible for probation, he underwent a "Treatment Alternatives for Safe Communities" (TASC) assessment to determine the

"appropriateness for TASC services" and his "likelihood of rehabilitation." According to a "TASC Finding Letter," defendant was determined to have "severe" cocaine and cannabis withdrawal and recommended for "outpatient services." The letter stated that if treatment services were made available to defendant, his likelihood of rehabilitation would be "strong."

¶ 23　　　　The only additional evidence presented to the trial court were two letters submitted by defendant in mitigation from Smith and his mother (the letters do not appear in the appellate record). The State then recommended a sentence of 18 years in prison, *i.e.*, concurrent sentences of 15 years in prison for count I; 18 years in prison for counts II, III, and IV; and 3 years in prison for count VI. It argued that aggravating factors in the case included the need for deterrence and defendant's prior history of delinquency, which it argued showed "a consistent level of criminality." It also asked the court to consider that defendant was convicted of delivering cocaine, one of the "most highly toxic substances" as identified by the legislature, as well as the fact that the offenses involved "a non-possessory use by someone with no other visible means of support." See 720 ILCS 570/411(1), (4) (West 2016). Further, the State noted the underlying offenses involved three separate deliveries of cocaine rather than "just one simple delivery" that might be considered "a blip on the radar." Finally, it argued that defendant failed to take advantage of resources available to him while on probation for his juvenile offenses.

¶ 24　　　　Defendant's counsel asked the court to impose a minimum sentence of six years in prison. He characterized the State's emphasis on the seriousness of the offense as "proper" but argued that defendant was an "addict" whose drug addiction "led him into these things." Counsel also pointed out that defendant had completed his education and was employed before becoming addicted to cocaine. He asserted defendant had potential and could benefit from drug treatment programs while in prison.

¶ 25    Defendant spoke on his own behalf, asserting that his history of juvenile delinquency was the result of "a lot of family problems going on." He maintained that he wanted to change his life and acknowledged that he needed help. Defendant also stated he knew he "messed up" but that he had "learned from [his] mistakes." He asked the court not to impose the 18-year sentence recommended by the State, noting "[t]his [was his] first adult record" and stating he did not believe he deserved 18 years.

¶ 26    As stated, the trial court sentenced defendant to a total of 12 years in prison— imposing concurrent sentences of 12 years for counts I, II, III, and IV, and 3 years for count VI. In setting forth its ruling, the court noted the seriousness of the offenses and found "strong aggravating factors" in the case, including that the offenses at issue involved "the unlawful delivery of the most highly toxic controlled substance by a person who would have no other visible means of support," that defendant's actions caused or threatened serious harm to the community, defendant's prior record, and deterrence. As to defendant's history of delinquency, the court stated as follows:

> "Now I understand it's a juvenile record. And I believe that the law or the medical research is pretty clear in regard[ ] to the development of juveniles which is one reason why that is treated differently. But I still think that in this particular case it's an issue, primarily because it shows everything that was done to try to help you become a productive member of society; and you just chose not to in this particular situation."

The court also determined that there was a lack of strong mitigating factors in the case. It noted defendant's argument regarding addiction but found he had been given previous opportunities to address substance abuse issues through probation.

¶ 27 The record shows that as the trial court set forth its ruling, defendant interjected comments and questions directed to the court, resulting in a back-and-forth exchange between the court and defendant. Specifically, defendant expressed that his crimes were the result of his addiction, commenting that he had been on probation with no police contact until he "started using cocaine" and became involved "with the wrong people"; did not consider himself a drug dealer; was remorseful; and that he "didn't sell that much."

¶ 28 The trial court responded, recalling its involvement with defendant's previous juvenile delinquency proceedings. It recounted defendant's history of delinquency and stated, "the thing that's *** frustrating and a little disheartening is that in juvenile court we went to great lengths." The court noted attempts to address defendant's "ongoing drug use" while he was on probation and also stated as follows:

> "I specifically recall when you got put on probation for that home invasion because you could have just as easily gone to the Department of Juvenile Justice. And as we sit here right now I'm wondering what the difference would be honestly because we worked hard. You worked hard. And then you can't not know that you cannot sell this amount of a controlled substance."

In response to defendant's comments, the court further emphasized that he sold drugs on more than one occasion and was being sentenced on multiple charges, including several Class X felonies.

¶ 29 After sentencing, in March 2018, a *pro se* letter from defendant was filed. In the letter, defendant asserted he was writing "to ask for an appeal on [his] case." He stated he understood what he did was wrong but believed his sentence was too "harsh" for his "first adult record." Defendant stated he wanted to "put motions in for [his] appeal" and then listed three

motions: (1) a "motion of an effective counsel," (2) a "motion to reconsider sentencing," and (3) a "motion of the p[ur]ity and strength of substances." Regarding the basis for his first motion, defendant stated as follows:

> "My public defende[r] wasn't representing me to the best of his knowledge. [H]e was hard to contact, and he never came [to] see me until the day of court, we hadn't [*sic*] have time to really talk about anything or come to any agreements and when I ask to put in motions he brush[ed] them away. And [defense counsel] didn't object to any unnecessary arguments."

¶ 30 The same day defendant's *pro se* letter was filed, the Livingston County circuit clerk's office sent him a response. The response characterized defendant's *pro se* filing as one "requesting motions and an appeal." It also informed defendant that the clerk's office did "not have the paperwork to provide [him]" and directed defendant to the law library of the facility where he was incarcerated.

¶ 31 Also in March 2018, defendant's counsel filed a motion to reconsider sentence on defendant's behalf, arguing the trial court should have imposed a lesser sentence based on defendant's history, potential for rehabilitation, and the impact on defendant's family. In April 2018, the court conducted a hearing and denied defendant's motion to reconsider. The record reflects defendant appeared at the hearing in person. During the hearing, no reference was made by the court or the parties to defendant's *pro se* letter.

¶ 32 This appeal followed.

¶ 33 II. ANALYSIS

¶ 34 A. Sentencing Errors

¶ 35 On appeal, defendant challenges his aggregate 12-year sentence as excessive and

an abuse of the trial court's discretion. He argues both that such a sentence was manifestly disproportionate to the nature of the offenses at issue and that the court considered improper factors in aggravation, specifically "its own personal feelings" toward defendant and his crimes.

¶ 36    Initially, defendant acknowledges that he has forfeited the sentencing issues he raises on appeal by failing to first bring them to the trial court's attention. See *People v. Hillier*, 237 Ill. 2d 539, 544, 931 N.E.2d 1184, 1187 (2010) ("[T]o preserve a claim of sentencing error, both a contemporaneous objection and a written postsentencing motion raising the issue are required."). However, he argues that this court should overlook his forfeiture because (1) the forfeiture doctrine may be relaxed where a trial judge's conduct is at issue, (2) plain error occurred, or (3) his trial counsel was ineffective for failing to preserve his alleged errors.

¶ 37    First, in *People v. Sprinkle*, 27 Ill. 2d 398, 401, 189 N.E.2d 295, 297 (1963), the supreme court held that there should be a "less rigid" application of the forfeiture rule when the conduct of the trial judge is at issue. In particular, the forfeiture rule may be relaxed under *Sprinkle* "when a trial judge oversteps his or her authority in the presence of the jury or when counsel has been effectively prevented from objecting because it would have fallen on deaf ears." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 612, 939 N.E.2d 403, 412 (2010). Ultimately, however, a defendant's forfeiture should only be excused under the *Sprinkle* doctrine "in extraordinary circumstances *** such as when a judge makes inappropriate remarks to a jury or relies on social commentary instead of evidence in imposing a *** sentence." *Id.*

¶ 38    Here, defendant has alleged nothing more than that his forfeiture should be relaxed because an issue he raises on appeal involves the sentencing judge's "conduct." He has not shown the existence of any extraordinary circumstances or anything to suggest that his objections would necessarily have fallen on "deaf ears." Under the circumstances presented, we find this case is not

- 12 -

an appropriate one in which to relax the forfeiture rule under *Sprinkle*.

¶ 39 Second, as stated, defendant also argues that his forfeiture should be excused under the plain-error doctrine and because his counsel was ineffective for failing to preserve his sentencing issues. To obtain relief under the plain-error doctrine, "a defendant must first show that a clear or obvious error occurred." *Hillier*, 237 Ill. 2d at 545. He then must "show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing." *Id.*

¶ 40 Additionally, ineffective-assistance-of-counsel claims are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Peterson*, 2017 IL 120331, ¶ 79, 106 N.E.3d 944. "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that his attorney's representation fell below an objective standard of reasonableness and a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *Id.* "A failure by the defendant to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *Id.*

¶ 41 Here, relaxation of the forfeiture rule based on either plain error or ineffective assistance of counsel requires a finding that the trial court committed error when imposing defendant's sentences. For the reasons that follow, we find defendant has failed to establish the occurrence of any error and, thus, cannot establish either plain error or that his counsel was ineffective for failing to preserve his alleged sentencing errors.

¶ 42 The Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In determining an appropriate sentence, a defendant's history, character, and rehabilitative potential, along with the seriousness of the offense, the need

to protect society, and the need for deterrence and punishment, must be equally weighed." (Internal quotation marks omitted.) *People v. Lawson*, 2018 IL App (4th) 170105, ¶ 33, 102 N.E.3d 761.

¶ 43　　　　"The trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010). "On review, the sentence imposed by the trial court will not be reversed absent an abuse of discretion." *People v. Pina*, 2019 IL App (4th) 170614, ¶ 20, 143 N.E.3d 794. "In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *People v. Fern*, 189 Ill. 2d 48, 53, 723 N.E.2d 207, 209 (1999). "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Id.* at 54.

¶ 44　　　　Defendant asserts that we may review *de novo* whether the trial court relied on an improper factor when imposing his sentence. See *People v. Williams*, 2018 IL App (4th) 150759, ¶ 18, 99 N.E.3d 590 (stating "[t]he question of whether the trial court relied on an improper factor in imposing the defendant's sentence presents a question of law, which we review *de novo*"). Ultimately, we note a strong presumption exists "that the trial court based its sentencing determination on proper legal reasoning, and a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." (Internal quotation marks omitted.) *Id.* On review, "[t]he defendant must affirmatively establish that the sentence was based on improper considerations." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 99, 145 N.E.3d 544.

¶ 45　　　　Here, the trial court sentenced defendant to concurrent terms of imprisonment for

five drug-related felony offenses, including four 12-year sentences for one Class 1 felony offense and three Class X felony offenses. Conviction for a Class 1 felony subjects a defendant to a sentencing range of 4 to 15 years in prison (730 ILCS 5/5-4.5-30(a) (West 2016)), while a conviction for a Class X felony subjects a defendant to a sentencing range of 6 to 30 years in prison (*id.* § 5-4.5-25(a)). Additionally, when determining an appropriate sentence for a defendant convicted of an offense under the Illinois Controlled Substances Act, a trial court may consider certain factors "as indicative of the type of offenses which the legislature deems most damaging to the peace and welfare of the citizens of Illinois and which warrants the most severe penalties." 720 ILCS 570/411 (West 2016). Those factors include that the defendant delivered cocaine, a "highly toxic controlled substance" as identified by the legislature, and that the case involved "non-possessory offenses by persons who have no other visible means of support." *Id.* § 411(1), (4).

¶ 46      When sentencing defendant to a total of 12 years in prison in this case, the trial court found the existence of "strong aggravating factors," including defendant's delivery of a highly toxic substance, that the case involved non-possessory offenses by someone with no visible means of support, that defendant's actions caused or threatened serious harm to the community, defendant's prior record, and the need for deterrence. Each of these factors was a proper consideration for the court and supported by the record. In fact, the presence of the first two factors are explicitly deemed by the legislature as circumstances warranting more severe penalties. *Id.* Additionally, while the present case represents defendant's first and only adult conviction, the record reflects that, at age 19, he had a lengthy and recent history of juvenile delinquency adjudications. His more recent juvenile offenses were for home invasion and aggravated battery. Additionally, defendant was on probation when he committed the offenses in this case.

¶ 47        As stated, defendant argues his aggregate 12-year sentence was manifestly disproportionate to the nature of the underlying offenses. Specifically, he asserts the trial court "mistakenly understood [his] involvement in a 'drug operation' to be much more extensive than what it actually was." He maintains that, "at most, [he was] an [in]experienced, low-level operative" and "more pawn than kingpin," warranting no more than the imposition of the mandatory minimum sentence of six years in prison. Relative to this argument, defendant contends the evidence showed (1) his drug-related conduct was being "managed" by an unidentified third party; (2) the police colluded with a "racist informant to establish a sales location that was within 1,000 feet of public housing," causing the elevation of charges against him; (3) he did not know the precise weight of the amount of cocaine sold during the first controlled buy; (4) he "foolishly provided his name" during the first controlled buy; (5) he had less cocaine to sell Spandet than promised at the time of the second controlled buy and commented on Spandet's scale, stating he needed to buy one for himself; (6) he did not solicit drug sales and the underlying deliveries were instigated by Spandet; (7) the amounts of cocaine he was convicted of selling were "quite modest"; and (8) he sold drugs to support his own addiction.

¶ 48        Contrary to defendant's assertions on appeal, the record does not reflect any mistaken finding by the trial court that he acted as a drug "kingpin" or was involved in a large-scale, drug-selling operation. Instead, it shows the court was familiar with defendant and well aware of the actions that led to the underlying charges in the case, the amounts of drugs defendant sold and which were found in his apartment, and defendant's claims that he sold drugs to support his own addiction.

¶ 49        Further, we disagree with any suggestion by defendant that the evidence against him showed he was a "pawn" or being "managed" by another person, or that he had a level of

involvement in the underlying offenses that warranted *only* a mandatory minimum sentence of six years in prison. Certainly, the evidence presented at trial indicated that the initial meeting between Spandet and defendant was facilitated by a third person. However, there was no evidence to support a finding that defendant's actions were being directed by that other person or that his culpability was anything less than what he clearly admitted to, *i.e.*, purchasing drugs, not only for his own personal use, but also to sell to others to make money. As the trial court found, the underlying circumstances involved a course of conduct by defendant and indicated that he was engaging in some type of drug selling "operation" from his residence. Such finding was supported by the record and not made in error.

¶ 50         We note defendant acknowledged to Hamilton that he sold cannabis "on and off" since he was "younger." Although he claimed that he had not been selling cocaine for very long, he did agree that he sold a couple of grams of cocaine a day. The audio recording of the first controlled buy reflects defendant anticipated and encouraged further dealings between himself and Spandet and promised to sell Spandet a gram of cocaine for $80 if Spandet continued to buy from him in the future. Additionally, while defendant may not have chosen the location of the initial controlled buy, the location was near his residence, which contained both drugs and items related to the sale of drugs, and evidence was presented that he gave Spandet directions regarding where to park his car for the second and third drug transactions.

¶ 51         Given the circumstances presented, we find no sentencing error by the trial court. The 12-year sentences it imposed were not manifestly disproportionate to the nature of the charged offenses.

¶ 52         On appeal, defendant also asserts that the trial court considered an improper factor in aggravation—its own personal and subjective feelings. We disagree.

¶ 53    Here, the record indicates the trial court was familiar with defendant and involved in sentencing him in connection with his previous juvenile offenses. As defendant points out, during his sentencing, he and the court engaged in a colloquy regarding defendant's criminal history and the current offenses. Although the court made comments indicating it found defendant's current circumstances "frustrating" and "a little disheartening" given his previous opportunities while on probation, when viewed as a whole, its comments do not reflect that it relied on any improper considerations when sentencing defendant. As discussed, the court clearly identified the aggravating factors it found persuasive and upon which it relied. Additionally, its comments to defendant directly reflect its assessment of matters related to the seriousness of the underlying offenses and defendant's rehabilitative potential, not matters outside of the record or its own personal opinions of defendant or his crimes.

¶ 54    In particular, the record shows a determination by the trial court that defendant's continued involvement in the criminal justice system, after previous opportunities for community-based sentences and treatment, reflected negatively on his potential for rehabilitation. Such a finding is supported by the record and not an abuse of the court's discretion. Specifically, we note the PSI report contains a statement from defendant's juvenile probation officer that defendant "never stopped using drugs while on [p]robation," failed to cooperate with substance abuse and mental health counseling, was unable to maintain employment, and "constantly lie[d] about work, counseling, and drug use."

¶ 55    Defendant additionally argues that the trial court erred by considering his "background" as aggravating rather than mitigating. He notes the TASC letter that stated he had a strong likelihood of rehabilitation; his own expressions of remorse and future goals; his strong family ties; his completion of high school; and his strong work ethic, which was only thwarted by

his substance abuse issues. Further, defendant maintains that the court should have considered his substance abuse problems as mitigation, given his youth and his strong likelihood for rehabilitation.

¶ 56 First, as stated, the trial court's comments clearly reflect doubts as to defendant's rehabilitative potential given his continued criminality and failure to take advantage of past opportunities while on probation. That finding was supported by the record and not an abuse of discretion.

¶ 57 Second, as acknowledged by defendant, "the trial court is not required to view drug addiction as a mitigating factor," and "a history of substance abuse is a 'double-edged sword' that the trial court may view as a mitigating or aggravating factor." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105, 126 N.E.3d 703 (quoting *People v. Mertz*, 218 Ill. 2d 1, 83, 842 N.E.2d 618, 663 (2005)). In this instance, the court acknowledged defendant's arguments regarding addiction but noted he had been given previous opportunities to address substance abuse issues through probation. Given that the record also shows defendant's consistent and continued involvement in criminal activity, along with his failure to cooperate with substance-abuse counseling while on probation, we can find no abuse of discretion by the court in refusing to view his alleged addiction issues as mitigating.

¶ 58 Third, to the extent defendant has identified mitigating factors in the case, we note that such evidence was not necessarily entitled to greater weight than aggravating factors or the seriousness of the offense. See *People v. Shaw*, 351 Ill. App. 3d 1087, 1093-94, 815 N.E.2d 469, 474 (2004) ("[A] defendant's rehabilitative potential and other mitigating factors are not entitled to greater weight than the seriousness of the offense."). As stated, the trial court clearly identified the aggravating factors it considered, which it characterized as "strong." The court's consideration

of those factors was not error and we will not substitute our judgment by reweighing the evidence presented.

¶ 59 Finally, we note that in challenging his sentence, defendant additionally argues his counsel was ineffective, not only for failing to preserve his sentencing issues, but also by "conceding that the State's argument regarding the seriousness of the offenses was correct" when his "conduct was not nearly as serious as the State made it out to be." The record shows that at sentencing, defendant's counsel began his argument to the court by stating as follows: "[The State] emphasizes I believe two points—the seriousness of the offense which is proper, and the history of the minor which again it was juvenile history." After these comments, defense counsel went on to argue that the underlying offenses were perpetuated by defendant's drug addiction and pointed out that defendant had completed his education and was employed before becoming addicted to cocaine. He also argued that defendant could benefit from treatment for his addiction.

¶ 60 Here, we find no deficient performance by defendant's counsel. Defendant was being sentenced for multiple drug-related offenses, including three Class X felonies and one Class 1 felony. Additionally, there is no dispute that the underlying offenses involved factors "indicative of the type of offenses which the legislature deems most damaging to the peace and welfare of the citizens of Illinois and which warrants the most severe penalties." 720 ILCS 570/411 (West 2016). Under these facts, defendant's offenses were serious and it was not error for his counsel to acknowledge that such an argument by the State was "proper" but then assert that a less severe sentence was, nevertheless, warranted based on mitigating circumstances, including defendant's substance-abuse issues. Accordingly, we find no error as alleged by defendant.

¶ 61 B. *Pro Se* Ineffective-Assistance-of-Counsel Claims

¶ 62 On appeal, defendant also argues the trial court erred by failing to inquire into his

posttrial *pro se* claims of ineffective assistance of counsel. He notes that he sent a letter to the court in March 2018, alleging his counsel's ineffectiveness but that his claims were never addressed below.

¶ 63        Under the supreme court's decision in *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984), and its progeny, a trial court is required to conduct an inquiry into a defendant's posttrial *pro se* claims of ineffective assistance of counsel to determine whether the appointment of new counsel is warranted to assist the defendant. *People v. Wilson*, 2019 IL App (4th) 180214, ¶ 18, 137 N.E.3d 868. "[T]he goal of any *Krankel* proceeding is to facilitate the trial court's full consideration of a defendant's *pro se* claim and thereby potentially limit issues on appeal." *People v. Ayres*, 2017 IL 120071, ¶ 13, 88 N.E.3d 732. To trigger a *Krankel* inquiry, "a *pro se* defendant is not required to do any more than bring his or her claim to the trial court's attention[.]" *People v. Moore*, 207 Ill. 2d 68, 79, 797 N.E.2d 631, 638 (2003).

¶ 64        However, this court has stated that "a defendant who fails to bring [a *pro se* ineffective-assistance] claim to the trial court's attention forfeits it notwithstanding having presented it in a letter to the court." *People v. Allen*, 409 Ill. App. 3d 1058, 1076-77, 950 N.E.2d 1164, 1182 (2011). In *Allen*, we held that the defendant forfeited his *pro se* claims of ineffective assistance, which were contained in a letter to the trial court, where he failed to raise those claims in subsequent appearances before the court. *Id.* at 1077. Similarly, in *People v. Lewis*, 165 Ill. App. 3d 97, 108-09, 518 N.E.2d 741, 748-49 (1988), the Second District found the defendant "waived" a claim, contained within a letter to the trial court, that he was not " 'properly defended' " by his counsel on the basis that it appeared "from the record, that the trial judge, defendant's counsel, and the State were all unaware of [the] defendant's letter as no mention was made of it, and [the] defendant did not himself refer to it in the post[ ]trial proceedings."

¶ 65　　　　This case is similar to both *Allen* and *Lewis*. Following his sentencing, defendant raised ineffective-assistance claims in a *pro se* letter directed to the trial court. The letter was filed and, the same day, responded to by the circuit clerk's office. However, nothing in the record indicates the trial judge, the State, or defense counsel knew about the letter or defendant's allegations. Additionally, defendant subsequently appeared before the court at a hearing on his motion to reconsider his sentence, filed with the aid of counsel, and made no reference to his *pro se* letter or his ineffective-assistance claims. Therefore, defendant has forfeited his ineffective-assistance claims and remand for an inquiry under *Krankel* is not required.

¶ 66　　　　　　　　　　　　III. CONCLUSION

¶ 67　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 68　　　　Affirmed.